CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 29 2010

JOHN F. CORCORAN, CLERK
BY:
            DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RICARDO ANTONIO CREWS, ) | Civil Action No. 7:09-CV-00115 |
| **Petitioner,** ) | |
| ) | **Memorandum Opinion** |
| v. ) | |
| ) | |
| GENE JOHNSON, DIRECTOR, ) | **By: Hon. James C. Turk** |
| VIRGINIA DEPARTMENT OF ) | **Senior United States District Judge** |
| CORRECTIONS ) | |
| **Respondent.** ) | |

Ricardo Antonio Crews ("Crews"), an inmate held at Wallens Ridge State Prison and proceeding pro se, brings this action to vacate his conviction pursuant to 28 U.S.C. § 2254. Petitioner Crews asserts that his rights under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution were violated because (1) petitioner was unable to test or challenge DNA evidence presented by the Commonwealth because it was previously destroyed, (2) the prosecution failed to prove his guilt beyond a reasonable doubt, and (3) petitioner was denied his right to effective assistance of counsel. Petitioner charges that his counsel was ineffective because his counsel failed to challenge the sufficiency of the evidence on appeal and failed to appeal the Virginia Court of Appeals' use of evidence that was not before the trial court. Respondent filed a motion to dismiss, to which Petitioner Crews responded, making the matter ripe for disposition. Upon review of the parties' arguments and the case record, the Court finds that the Defendant's Motion to Dismiss must be **GRANTED**. Owing to the complexity and the importance of the constitutional issue that Petitioner has raised, however, the Court believes that a certificate of appealability should also be **GRANTED**.

## I. Factual and Procedural Background

On July 2, 2002, Crews was arrested and charged with the rape of Ms. Melissa Lipscomb ("Ms. Lipscomb").   According to trial testimony, Ms. Lipscomb was living in an apartment on Old Forest Road in Lynchburg, Virginia on October 5, 1999.  Ms. Lipscomb returned home from work a little after nine p.m. and began watching a World Series game with her boyfriend, Chris Phillips, and another friend, Houston Walthall.  About twenty minutes after returning home, she heard a knock on the front door and subsequently opened the door to see two black males wearing bandanas over their faces.  The two men pushed past her into the apartment brandishing a gun and demanded all the drugs and money in the apartment.[1]  At some point during the robbery, Ms. Lipscomb led one of the intruders to her bedroom to search for money in her purse. In the bedroom the intruder proceeded to rape Ms. Lipscomb.

After the intruders left, Ms. Lipscomb told Mr. Phillips that she had been raped and he called 911.  Ms. Lipscomb was transported to emergency room at Lynchburg General Hospital and examined by Delores Soyars, a forensic nurse examiner.  Ms. Soyars collected fluid samples from Ms. Lipscomb's vagina with Q-tips, labeled the Q-tips and placed them in a sealed container which was part of the Physical Evidence Recovery Kit ("PERK kit").  This PERK kit was numbered for identification and turned over to Investigator P.K. Morris of the Lynchburg Police Department.

The PERK kit was sent to the Virginia Division of Forensic Science lab in Roanoke, Virginia for analysis.   On or about February 10, 2000, a forensic scientist at the lab, Nicole Graham, performed an eight (8) point analysis of the perpetrator's sperm that had been collected in the PERK kit.   From the results of this analysis a DNA profile was developed and compared

---

[1] It appears from the record that Ms. Lipscomb's boyfriend was involved in the drug trade at the time.

against the Virginia DNA databank. There were no matches. Although the eyewitnesses to the attack suggested that an African-American male named Marcus Wright should be considered a possible suspect, the results of comparing the DNA from the PERK kit with a DNA profile of Marcus Wright excluded him as a donor. The investigation by the Lynchburg Police Department ("LPD") was otherwise fruitless and they had no suspects. The case, accordingly, languished.

In February of 2002, as part of a routine review of "cold cases," Ms. Graham tested the DNA profile from the Lipscomb case against the Virginia DNA Databank and got a "cold hit." The cold hit matched Crews' DNA profile with the unidentified DNA profile from the Lipscomb case. Ms. Graham notified the LPD of the "cold hit" and provided them with the identification of Crews. After receiving this notification from Ms. Graham, the LPD located Crews, who was in jail on a probation violation at the time, and asked him about his involvement with the case. Crews denied having known, met, or seen Ms. Lipscomb, Mr. Phillips, or Mr. Walthall. Crews denied ever having had sex with or raping Ms. Lipscomb. After being told that his DNA had matched the DNA found at the scene, Crews was silent for two minutes and then said that he had no recollection of this happening. Investigator Hise continued to question Crews and sought to entice Crews to identify the second perpetrator of the robbery by implying his sentence would be lighter if he identified his accomplice. Although Crews made some inculpatory statements indicating a desire to "set someone up" as his co-defendant, at no point in time did Crews admit he had been involved with the crime in any fashion. Crews was never able to provide another name as a co-defendant. Crews was eventually arrested on the instant charges on July 2, 2002.

After several psychological evaluations and an extended stay in Western State Hospital, petitioner was indicted by the Grand Jury on seven counts on February 2, 2004. The counts were as follows: three counts of use of a firearm during the commission of a felony, one

- 3 -

count of abduction with the intent to defile, one count of statutory burglary with the intent to commit murder, rape, or robbery while armed with a deadly weapon, one count of attempted robbery, and one count of rape.   In preparation for trial, in early March of 2004, the Commonwealth's Attorney sought to ascertain the whereabouts of the biological evidence for retesting by the original lab.  Investigator Hise then informed the Commonwealth's Attorney that the biological evidence was missing.  Crews' counsel was notified on March 9, 2004, that the biological evidence had disappeared and that no additional testing would be possible.  On May 21, 2004, the trial court held a suppression hearing on the admissibility of the DNA evidence which was missing.    LPD computer records indicated that the PERK kit, which had been returned to the LPD, was destroyed on March 15, 2001.  There were no records explaining why the PERK kit was destroyed nor who authorized its destruction.[2]  In testimony at the suppression hearing, Investigator Hise of the LPD swore that he had not ordered the destruction of the PERK kit nor signed an authorization for the destruction of the evidence.  After the conclusion of the hearing the trial judge, relying on Arizona v. Youngblood,[3] decided that the evidence was admissible.

Crews was tried in front of a jury on December 13-14, 2004.  This trial ended with a deadlocked jury and mistrial, nine votes in favor of conviction and three votes in favor of acquittal.  Some of the dissenters expressly questioned the believability of the DNA evidence. Following the mistrial, on January 20, 2005, Investigator Hise turned over to the Commonwealth's Attorney a form signed and dated November 27, 2000 which indicated that he

---

[2] The analyst who tested the PERK kit testified that there was sufficient biological material in the PERK kit to allow for future testing.

[3] Arizona v. Youngblood, 488 U.S. 51, 58 (1988) (holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").

had authorized the destruction of the DNA evidence.[4]   Petitioner was retried on June 1, 2005. At the second trial, Investigator Hise testified that he did remember having ordered the destruction of the evidence and having signed the authorization form for its disposal. Hise explained the evidence had been destroyed because the case had been inactive for a long period of time and he believed "there wasn't no [sic] value in keeping the evidence." 06/01/05 Tr. at 178.   Crews was convicted at the conclusion of the June 1, 2005 trial. On August 12, 2005, he was sentenced to fifty years and one month of incarceration.

Petitioner Crews was arrested, indicted, and eventually convicted on the basis of one crucial piece of evidence: the February 20, 2002 match between his DNA profile and the DNA profile developed from evidence in the unsolved 1999 Lipscomb rape investigation, the "cold hit" found by randomly searching the state DNA database.   The essence of all of petitioner's claims center on the fact that the DNA evidence from the 1999 investigation was destroyed by the government and he was not afforded the opportunity to challenge the "cold hit" or independently test the 1999 DNA sample.   Crews asserts that his rights under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution were violated because (A) he was unable to test or challenge DNA evidence presented by the Commonwealth and, similarly, (B) he was denied due process when the prosecution failed to prove his guilt beyond a reasonable doubt. He also alleges he was denied his right to effective assistance of counsel because his counsel (C) failed to challenge the sufficiency of the evidence on appeal and (D) failed to appeal the Virginia Court of Appeals' use of evidence that was not before the trial court.

---

[4] It is not clear when the LPD found this authorization slip. According to testimony at the second trial, the LPD evidence clerk did not remember when she found the authorization slip nor when she gave it to Investigator Hise.   It was turned over to the Commonwealth's Attorney by Investigator Hise on January 20, 2005, approximately a month after Petitioner's first trial ended in a mistrial.

- 5 -

## II.  Sufficiency of the Evidence Claim Is Procedurally Barred

Federal courts grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Procedurally, however, the Supreme Court has established that a federal court may not grant habeas relief for unexhausted state claims not presented to the highest state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S.Ct. 1728 (1999). All of the claims Petitioner makes were previously raised in his state habeas petition, and thus are considered to be exhausted and susceptible to federal habeas review.[5]

Even if all claims have been properly exhausted, a habeas claim may not be heard if it was procedurally barred in state court. A claim is procedurally barred in Virginia when the claim, on a non-jurisdictional issue, could have been presented at trial and on appeal but was not. Slayton v. Parrigan, 215 Va. 27, 205 S.E.2d 680 (1974). Federal courts reviewing habeas claims may not review a procedurally barred claim because the claim is considered to have been adjudicated on independent and adequate state law grounds. See Coleman v. Thompson, 501 U.S. 722 (1991).  See also Harris v. Reed, 489 U.S. 255, 262 (1989) ("A federal claimant's procedural default precludes habeas review....if the last state court rendering a judgment in the case rests its judgment on the procedural default."). Petitioner's claim (B) alleges he was denied due process when the prosecution failed to prove his guilt beyond a reasonable doubt. This claim was not raised on direct appeal, and consequently the Circuit Court for the City of Lynchburg found it to be procedurally barred.[6]  Thus, petitioner's claim (B) cannot be reviewed

---

[5] His petition for Habeas Corpus to the Circuit Court for the City of Lynchburg was denied on June 13, 2008. His appeal to the Virginia Supreme Court on his habeas petition was denied on April 1, 2009.

[6] The Circuit Court for the City of Lynchburg also found that the Petitioner's claim (A) was procedurally barred under the Virginia precedent Henry v. Warden, 265 Va. 246, 576 S.E.2d 495 (2003).  In the Fourth Circuit, however, the procedural bar of Henry v. Warden is not an adequate and independent state ground that precludes federal habeas review of Petitioner's claims.  See Bell v. True, 413 F.Supp.2d 657 (W.D.Va. 2006) ("However,

by this Court, because the state court's conclusion that the claim was never presented, and therefore procedurally defaulted, is an independent and adequate state ground. See Gray v. Netherland, 518 U.S. 152 (1996).

Petitioner correctly notes an exception: this procedural bar rule is inapplicable where the failure to grant habeas review will "result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. A "fundamental miscarriage of justice" is generally considered to be the extraordinary case where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 495 (1986). See also Schlup v. Delo, 513 U.S. 298 (1995). Although Petitioner does not identify the second exception to this procedural bar rule, this Court notes that the procedural bar rule is also inapplicable "when the habeas petitioner can show 'cause' for the default and 'prejudice' attributable thereto." Murray, 477 U.S. at 495. The Supreme Court has decreed that "counsel's ineffectiveness will constitute cause only if it is a constitutional violation." Coleman, 501 U.S. at 750. Although the Petitioner expressly asserted only that this conviction would result in a fundamental miscarriage of justice, he implicitly asserted that there was both "cause" and "prejudice" by claiming ineffective assistance of counsel. This is considered in the analysis of Petitioner's ineffective assistance of counsel claim *infra*. As to Petitioner's claim that a fundamental miscarriage of justice has resulted from this conviction, the Court finds that he has not sufficiently alleged "actual innocence" and, therefore, his claim (B) on the sufficiency of the evidence is procedurally barred.

Claims of actual innocence that would be sufficient to defeat this procedural bar rule are, according to the Supreme Court, extremely rare. See Schlup, 513 U.S. at 324 ("Experience has

---

where the petitioner's claim concerns a federal constitutional issue, the rule set forth in Henry does not prevent federal habeas review of the claim.").

taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare."). The Supreme Court has specifically held that "to be credible" such claims "require[] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Id. Thus a successful actual innocence claim must "show that it is more likely than not that no reasonable juror would have convicted him *in light of the new evidence*." Id. at 327 (emphasis added). Crucially, Petitioner Crews has not alleged the existence of any new evidence at all. The basis for his assertion that this conviction would be a fundamental miscarriage of justice is merely that the evidence was insufficient to support his conviction. See Habeas Pet. Pg. 5. Because he has not successfully alleged actual innocence by coming forward with new evidence, he has also not sufficiently alleged a fundamental miscarriage of justice. Petitioner's claim (B) must be deemed to be procedurally barred.

### III. Analysis on the Merits

All of Petitioner's other claims were raised in his state habeas petition and considered on the merits by the state court. Pursuant to the reforms of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal habeas court may not grant habeas relief for any claim "that was adjudicated on the merits in State court proceedings," unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); see Williams v. Taylor, 529 U.S. 362, 367 (2000). For the purposes of 28 U.S.C. § 2254 (d)(1), an adjudication on the merits applies to all claims that were reached and decided in state court, even if in summary fashion. Thus, to grant Petitioner

- 8 -

habeas relief, this Court must determine that the state court decisions on these claims were contrary to, or an unreasonable application of, clearly established Federal law.

The Court of Appeals for the Fourth Circuit has accorded the "contrary to" and "unreasonable application" clauses independent meaning, comprehensively defining both. See Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), *overruled on other grounds by* Williams, 529 U.S. 362.   A state court decision is "contrary to" the Supreme Court's clearly established precedent if (1) the state court "arrives at a conclusion opposite to that reached by the Supreme Court as a matter of law" or (2) the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that reached by the Supreme Court. Williams, 529 U.S. at 405.   According to the Williams Court, a state court decision is an "unreasonable application" of clearly established federal law if the state court "identifies the correct legal rule...but unreasonably applies it to the facts of the particular state prisoner's case." Id.

The "unreasonable application clause" of the AEDPA as interpreted by the Fourth Circuit, however, is slightly broader – and the Supreme Court has declared that the "Fourth Circuit's interpretation...is generally correct." Id. at 407.   The "unreasonable application clause" also applies, according to the Fourth Circuit, where a state court unreasonably extends (or fails to extend) certain legal principles from Supreme Court precedent to new contexts.  And although the Supreme Court opined that this holding  "may perhaps be correct," it also noted that there were "some problems of precision" with this classification, before finally refraining from "decid[ing] how such 'extension of legal principle' cases should be treated." Id. at 408.   In Ramdass v. Angelone, 530 U.S. 156, 166 (2000), decided the same term as Williams, the Supreme Court appeared to endorse, though without discussion, at least part of the Green

definition by declaring that an unreasonable application may be found when "the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." What is certain is that the Supreme Court has never expressly rejected the Fourth Circuit's conclusion that an unreasonable application of clearly established Federal law might also arise when a state court "either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407. See Oken v. Corcoran, 220 F.3d 259 (4th Cir. 2000) (noting that the Supreme Court left open the question of whether the totality of the Green definition was correct). In the Fourth Circuit, therefore, it is still good law that an unreasonable application of federal law would be either (1) "applying a precedent in a context different from the one in which the precedent was decided and one to which the extension of the legal principle of the precedent is not reasonable" or (2) "failing to apply the principle of a precedent in a context where such failure is unreasonable." Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2000) (citing to Green, 143 F.3d at 870 (4th Cir. 1998), *overruled on other grounds by* Williams, 529 U.S. 362 (2000).

With respect to Crews' claims of ineffective assistance of counsel, it is clear that the state court decision denying those claims was neither contrary to, nor an unreasonable application of, clearly established Federal law. With respect to his claim that his due process rights were violated when the trial court admitted into evidence DNA test results from the missing evidence, the Court must also conclude that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law. Although this Court cannot conclude that the state court decision unreasonably extended the legal principle of Arizona v.

Youngblood to a different, inapplicable context, the Court certifies the issue for appeal to the Fourth Circuit due to both the complexity and implications of this decision.

### A. Ineffective Assistance of Counsel Claims

In order to successfully challenge a sentence on the basis of ineffective assistance of counsel, a petitioner must satisfy the test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Court held that a finding of ineffective assistance of counsel requires a two-prong showing, and a habeas petitioner bears the burden of persuasion for both prongs. Id. at 687. Failure to satisfy either prong is fatal to a petitioner's claim, so "there is no reason for a court ... to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

To satisfy the first prong, a habeas petitioner must show that his counsel's performance "fell below an objective standard of reasonableness," where reasonableness is determined under the "prevailing professional norms." Id. at 688. In assessing an attorney's performance, judicial scrutiny must be "highly deferential" to tactical decisions, and the court must filter from its analysis the "distorting effects of hindsight." Id. at 689. Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

Under the second Strickland prong, a petitioner must show that prejudice resulted from counsel's deficient performance. Id. at 692. To establish prejudice, a petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence of the outcome." Id. at 694.

Petitioner Crews alleges that his counsel was constitutionally ineffective in two ways. First, Crews alleges that his counsel failed to challenge the sufficiency of the evidence in his direct appeal. If his counsel were constitutionally ineffective by failing to appeal this issue, Crews would have also demonstrated cause and prejudice sufficient to surpass the procedural bar to his sufficiency of the evidence claim, discussed *infra*. Second, Crews alleges that his counsel provided constitutionally deficient assistance by failing to appeal the Virginia Court of Appeals' consideration of evidence in its decision on the suppression issue that was not before the trial court at the suppression hearing.

### 1. Counsel's Failure to Challenge Sufficiency of Evidence in Direct Appeal

The conclusion by the Lynchburg Circuit Court, that the failure of Crews' counsel to challenge the sufficiency of the evidence in his direct appeal did not constitute ineffective assistance of counsel, is neither "contrary to" nor "an unreasonable application of, clearly established Federal law." § 2254(d)(1). Although the Lynchburg Circuit Court did not specifically identify Strickland as the standard that must be applied, the analysis undertaken by the court was entirely consistent with the performance prong of the Strickland analysis. The court cited Jackson v. Warden, 271 Va. 434, 451, 627 S.E.2d 776, 791 (2006), for the proposition that "winnowing out weaker claims on appeal and focusing on those more likely to appear, far from being evidence of incompetence is the hallmark of effective...advocacy." The court concluded that counsel's decision not to challenge the sufficiency of the evidence in the direct appeal was precisely this type of strategic decision, and therefore permitted by relevant precedent. In reaching this conclusion, the court relied on counsel's explanation that the DNA test "excluded the possibility that someone other than the petitioner committed the rape....[and thus I] chose to challenge the admissibility of the DNA evidence...the lynchpin of the

Commonwealth's case." See Final Order, Crews v. Director, Dept. of Corrections, Record No. CL08002479-00, Pg. 5 (June 13, 2008). Although counsel was mistaken that the result of the test "excluded the possibility that someone other than petitioner committed the rape," he was correct that a successful appeal on the issue of the admissibility would be dispositive.[7]  Counsel was entitled to decide that, strategically, the strongest claim challenged the admissibility, not the sufficiency, of the evidence. See Smith v. Carolina, 882 F.2d 895, 899 (4th Cir. 1989) (holding that counsel can "strategically elect" what claims to raise and this does not constitute ineffective assistance of counsel).   This Court does not dispute that counsel's decision was a strategic decision, and therefore must find that the Virginia court's decision holding the same was not an unreasonable application of clearly established federal law.

### 2. Counsel's Failure to Challenge Consideration of Testimony From Trial

Petitioner Crews also alleges that his counsel was constitutionally ineffective because he failed to challenge the Court of Appeals' consideration of evidence from the second trial in deciding his appeal of the suppression issue. At the suppression hearing before the first trial, Investigator Hise testified that he did not order the destruction of the PERK kit. See 05/21/05 Tr. at 32-38. At the second trial, however, Hise was shown a copy of a form bearing his signature that authorized the destruction of the evidence. He confirmed that he had signed the order and testified that he ordered the PERK kit destroyed. See 06/01/05 Tr. at 177-78. The Court of

---

[7] Counsel is mistaken that the results of the DNA test excluded the possibility that "someone other than the petitioner" committed the rape. First of all, while the results of DNA tests can be interpreted to exclude the possibility that *a particular* "someone other than the suspect" committed the rape, they may never be the basis for excluding the possibility that *any, random* "someone other than the suspect" committed the rape. This is because DNA profiles are probability based, as explained *infra*. Second, and most importantly, defense counsel has fallen victim to the common, and confusing, prosecutor's fallacy. "The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." McDaniel v. Brown, 130 S.Ct. 665, 670 (2010). Here the defense attorney's comment demonstrates that he has made the same theoretical mistake detailed in McDaniel: conflating the random match probability with the probability that his client was innocent.  Additional statistical interpretive errors present in this case are more fully discussed *infra*, specifically the application of random match probability to the "cold-hit" scenario present here.

Appeals, affirming the trial court's decision not to suppress the DNA evidence, found that Hise had not exhibited "bad faith."   The Court of Appeals quoted Hise's trial testimony, not his suppression hearing testimony, in support of their conclusion.   Crews asserts that this was clear error and that his counsel should have appealed the error to the Supreme Court of Virginia.

The Lynchburg Circuit Court, considering his habeas petition, disagreed with Crews and found that any argument that the Court of Appeals was barred from considering the evidence at trial was frivolous, "futile, and a complete waste of time."   See Final Order, Crews at Pg. 6. Accordingly, the court concluded that his counsel had acted appropriately and was not constitutionally ineffective.   This Court agrees that the decision by the Virginia Court of Appeals was not clear error.   To the contrary, Virginia law is clear that when the Court of Appeals "reviews the trial judge's refusal to suppress evidence, [it] consider[s] the 'evidence adduced at both the trial and the suppression hearing.'"   Kidd v. Commonwealth, 38 Va. App. 433, 439, 565 S.E.2d 337, 340 (2002).   Although the Lynchburg Circuit Court again failed to cite Strickland, the analysis of counsel's performance is identical to the performance prong analysis required by Strickland.   The court found that "counsel's decision not to make a frivolous argument on appeal is the hallmark of effective advocacy."   See Final Order, Crews at Pg. 6 (citing Jones v. Barnes, 463 U.S. 745 (1983)).   Because Virginia law clearly contradicts Crews' contention, i.e., that the Court of Appeals should not have considered evidence adduced at trial, any argument to the contrary by Crews' counsel would have been futile.   "Ineffective assistance claims predicated on failure to make wholly frivolous or unethical arguments will generally be dispensed with under Strickland's [performance] prong."   Lockhart v. Fretwell, 506 U.S. 364, 382 (1993).   Here, given the futility of advocating for Crews' position on this issue, bringing an appeal would have been frivolous, futile and a complete waste of time.   Counsel for the Defendant was not

- 14 -

constitutionally ineffective for refusing to make this argument on appeal, and, thus, the Lynchburg Circuit Court decision holding the same was not an unreasonable application of clearly established Federal law.

### B. Due Process Implications of Permitting DNA Test Results as Evidence

Petitioner's strongest argument is that he was "denied his right to due process when the trial court allowed DNA evidence…to be presented by the Commonwealth" at trial even though it had been destroyed and the Petitioner was unable to test the evidence. Habeas Pet. Pg. 4.  The Virginia Court of Appeals, relying on <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988),  held that the use of the DNA test results at trial did not violate Crews' right to due process because the DNA evidence was not materially exculpatory, but merely potentially useful.

> The Due Process Clause…makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant materially exculpatory evidence.  But we think that the  Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

<u>Youngblood</u>, 488 U.S. at 57.  Because <u>Youngblood</u> is still good law, this Court cannot conclude that the Virginia Court of Appeals' reliance on it was "contrary to…clearly established federal law." § 2254(d)(1).  And although the instant case presents several distinguishing characteristics from <u>Youngblood</u>, including characteristics which might suggest <u>Youngblood</u> should not apply in these circumstances, this Court cannot conclude that the Virginia Court of Appeals, by extending <u>Youngblood</u> to these circumstances, engaged in an "unreasonable application of clearly established federal law." § 2254(d)(1).    Thus, this Court denies Crews' Petition for a writ of Habeas Corpus.  Nevertheless, this Court believes that the issues that Crews has raised are of sufficient import and complexity that they require the granting of a certificate of appealability.

### 1. Virginia Court of Appeals' Reliance On *Arizona v. Youngblood* Was Not Contrary To Clearly Established Federal Law

Although in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court decided that the Due Process Clause of the Fourteenth Amendment requires states to disclose to criminal defendants all favorable evidence that is material to either guilt or punishment, the Supreme Court did not address the implications of the Due Process Clause with respect to destroyed, potentially favorable evidence until <u>California v. Trombetta</u>, 467 U.S. 479 (1984).    In <u>Trombetta</u>, the Court heard a due process challenge by several California petitioners to state DUI prosecutions where the inculpatory evidence, breath samples subjected to Intoxilyzer tests, was destroyed prior to trial.   The Supreme Court concluded that the Due Process clause is not violated unless the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." <u>Trombetta</u>, 467 U.S. at 489.

The Court then addressed the very same issue in <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988).  The petitioner in <u>Youngblood</u> had been convicted of the abduction and rape of a young boy.  He challenged his conviction because the clothing of the young boy, which bore semen stains, was improperly preserved and, therefore, deteriorated beyond any possible use in identifying or excluding the petitioner.[8]  Although the Arizona Supreme Court concluded that, "when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process," the United States Supreme Court reversed.   <u>Youngblood</u>, 488 U.S. at 56 n.* (citations omitted).   The Supreme Court first distinguished between "materially exculpatory"

---

[8] At the time of the <u>Youngblood</u> investigation, the tests were blood typing tests, not DNA tests.

evidence and "potentially exculpatory" evidence.   Id. at 57.  The Supreme Court then held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." Id. at 58.

When the Youngblood Court reached these conclusions, it highlighted several key rationales in support of them from Trombetta.  The Court noted that (1) the officers in Trombetta were "acting in good faith and in accord with their normal practice," (2) "the chances that preserved samples would have exculpated the defendants were slim,"   (3) "defendants had alternative means of demonstrating their innocence."   Id. at 56 (citing Trombetta, 467 U.S. at 486).  The Youngblood Court also explained that "whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id.  Additionally, the Youngblood Court wished to avoid "imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Id.   In the end, the Youngblood Court decided that distinguishing between "materially exculpatory" and "potentially useful" evidence, as well as requiring bad faith, already hinted at in Trombetta, would meet both of these concerns: "[it] limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines [their obligation] to that class of cases where the interests of justice most clearly require it." Id.

Although the distinction between materially exculpatory and potentially useful and the corresponding "bad faith requirement" has received substantial criticism,[9] it has been both

---

[9] The majority of the critiques have arisen in State court under interpretations of State constitutions. State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999) ("The Youngblood analysis apparently permits no consideration of the materiality of the missing evidence or its effect on the defendant's case.  The conclusion is that this analysis substantially increase the defendant's burden while reducing the prosecutor's burden at the expense of the defendant's fundamental right to a fair trial.");  State v. Morales, 232 Conn. 707, 723, 657 A.2d 585, 593 (1995) ("Fairness dictates that when a person's liberty is at stake, the sole fact of whether the police or another state official acted in good or bad faith in failing to preserve evidence cannot be determinative of whether the criminal defendant

reaffirmed by the Supreme Court and widely adopted by Circuit Courts of Appeal nationwide. See Illinois v. Fisher, 540 U.S. 544 (2004) (holding that failure to preserve potentially useful evidence does not violate due process "unless a criminal defendant can show bad faith on the part of the police"); Olszewski v. Spencer, 466 F.3d 47 (1st Cir. 2006) (same); Yarris v. County of Delaware, 465 F.3d 129 (3d Cir. 2006) (adopting bad faith requirement and finding bad faith); Harvey v. Horan, 278 F.3d 370 (4th Cir. 2002) (adopting bad faith requirement for analysis of post-conviction claims as well); United States v. Wright, 260 F.3d 568 (6th Cir. 2001) (adopting bad faith requirement). Thus, when the Virginia Court of Appeals relied on Youngblood in differentiating between materially exculpatory evidence and potentially exculpatory evidence, and then in requiring Crews to demonstrate bad faith on the part of the police, they were not acting contrary to clearly established federal law.

 2. Virginia Court of Appeals' Decision Was Not An Unreasonable Application Of
Principle Set Forth In *Youngblood*

It is a significantly closer question as to whether the decision by the Virginia Court of Appeals was an unreasonable application of Youngblood. Importantly, a writ may not be granted simply because the "relevant state court decision applied clearly established federal law erroneously or incorrectly...rather, that application must also be unreasonable." Booth-El v.

---

received due process of law."); State v. Osakalumi, 194 W.Va. 758, 766, 461 S.E.2d 504, 512 (1995) ("Fundamental fairness requires that this Court to evaluate the State's failure to preserve potentially exculpatory evidence in the context of the entire record"). See also, State v. Delisle, 162 Vt. 293, 309, 648 A.2d 632, 642 (1994); Ex parte Gingo, 605 So.2d 1237, 1241 (Ala. 1992); Commonwealth v. Henderson, 411 Mass. 309, 310-311, 582 N.E.2d 496, 497 (1991); State v. Matafeo, 71 Haw. 183, 186-187, 787 P.2d 671, 673 (1990); Hammond v. State, 569 A.2d 81, 87 (Del. 1989); Thorne v. Dept. of Public Safety, 774 P.2d 1326, 1330, n. 9 (Alaska 1989).

In place of Youngblood, most states have adopted balancing tests to resolve the disputes. See Correia v. Rowland, 263 Conn. 453, 820 A.2d 1009 (2003) ("The trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its non-availability to the defense, and the prejudice to the defendant caused by the unavailability of the evidence."); State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999) (adopting a balancing test from Hammond v. State, 569 A.2d 81 (Del. 1989), which "focuses on the following three factors: (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence, considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to sustain the conviction").

Nuth, 288 F.3d 571, 576 (4th Cir. 2002).   There are several facts present in this case that distinguish it from circumstances considered in Youngblood, Fisher and Trombetta – but none of these facts make the Court of Appeals' decision unreasonable.   Although the context is somewhat different, the Court does not conclude that the Virginia Court of appeals "appl[ied] a precedent in a context different from the one in which the precedent was decided and one to which the extension of the legal principle of the precedent is not reasonable."   Robinson, 438 F.3d 350, 355 (4th Cir. 2000).   Because Crews does not allege bad faith, and there is no evidence in the record of bad faith, the reasonableness of applying Youngblood in these circumstances turns primarily on the dichotomy of materially exculpatory vs. potentially useful evidence that Youngblood imposes.

### i.  Prosecution's Reliance on the Destroyed Evidence

In the instant case, the match of the DNA profile of the destroyed evidence with Crews' DNA profile was, effectively, the only evidence presented by the prosecution.[10]  In contrast,  the evidence which was destroyed in Youngblood was never used at all by the prosecution, a fact the Youngblood Court seemed to find significant.   "The likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than in Trombetta, but here, unlike in Trombetta, the State did not attempt to make any use of the materials in its own case in chief."   Youngblood, 488 U.S. at 56.   In Youngblood, there was a substantial quantity of evidence suggesting the guilt of the petitioner, including an identification by the victim, which obviated the prosecution's use of the destroyed evidence.   Justice Stevens noted that the evidence in favor of guilt was so strong as to overcome an instruction by the trial judge

---

[10] The eyewitnesses to the rape could not identify the petitioner and were able only to identify the perpetrator as a young, black male.  Petitioner was, at the time of the incident, a young black male.  The significance of this evidence, however, is minimized by the fact that the Petitioner was identified by a DNA test.   Because DNA is correlated with race, it is more likely that a coincidental DNA match would be between individuals of the same race.

that the missing evidence permitted the inference that the true facts were against the State's interest: "the jurors in effect indicated that, in their view, the other evidence at trial was so overwhelming that it was highly improbable that the lost evidence was exculpatory." Youngblood, 488 U.S. at 60 (Stevens, J., concurring in the judgment).   In United States v. Belcher, 762 F.Supp. 666, 672 (W.D.Va. 1991), the district court noted the importance of the distinction that the Youngblood Court made regarding the prosecutor's use of evidence in their case in chief.   Consequently, in Belcher, the court dismissed an indictment in a prosecution where "state officials intentionally destroy[ed] evidence that [was] absolutely crucial and determinative to a prosecution's outcome."[11]

This Court cannot conclude, however, that simply because the destroyed evidence was used by the prosecution, the Virginia Court of Appeals unreasonably applied federal law in the instant case by "applying a precedent in a context different from the one in which the precedent was decided and one to which the extension of the legal principle of the precedent is not reasonable." Robinson, 438 F.3d at 355.   First, the breath-analysis results from the samples destroyed in Trombetta were used by the prosecution.   In fact, the Trombetta Court seemed to indicate that the centrality of the evidence to the prosecution's case should be specifically considered: "when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing...the State's *most probative* evidence." Trombetta, 467 U.S. at 479 (emphasis added).   And the Trombetta Court specifically

---

[11] The court in Belcher alternatively found the evidence to be "materially exculpatory" by interpreting the "potentially useful" language from Youngblood not to include "destroyed evidence absolutely crucial and determinative to this prosecution's outcome." Id. at 672. This Court believes that the Belcher court was reading "materially exculpatory" much more broadly than required by Supreme Court precedent. Materially exculpatory evidence as interpreted by the Supreme Court is specifically evidence "the exculpatory value of [which is] apparent before the evidence was destroyed." Youngblood, 488 U.S. at 56 n. *. In Youngblood, therefore, the Court required the respondent to show "that the police knew the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing" in order to demonstrate it was materially exculpatory. Id.

refused to suppress the State's most probative evidence.   Following <u>Youngblood</u>, the Supreme Court considered the situation again as presented by <u>Illinois v. Fisher</u>, 540 U.S. 544 (2004). There, a substance alleged to be cocaine that had been seized from the petitioner was later destroyed during the course of the petitioner's 10-year flight from justice. The Supreme Court permitted evidence indicating that the substance was cocaine to be admitted absent any testing by the defendant, thereby providing a basis for the cocaine possession conviction.[12]  "We disagree that <u>Youngblood</u> does not apply when the contested evidence is…essential and determinative to the outcome of the case… the applicability of the bad faith requirement in <u>Youngblood</u> depended not on the centrality of the contested evidence to the prosecution's case…but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence." <u>Fisher</u>, 540 U.S. at 548-49. Thus, notwithstanding <u>Belcher</u>, which was decided in this district but apparently not appealed to the Fourth Circuit, clearly established Federal law after <u>Youngblood</u> does not permit an exception even if the evidence is crucially important to the prosecution's case. Although this Court notes that circumstances in <u>Fisher</u> are very different from the circumstances here, [13]  the essence of the Supreme Court's conclusion does not permit a distinction. Accordingly, this Court can not conclude that the Virginia Court of Appeals unreasonably applied federal law by

---

[12] In <u>Fisher</u>, the cocaine had been tested four separate times, with each test confirming the previous one.  <u>Fisher</u>, 540 U.S. at 548.  Another distinction between <u>Fisher</u> and the instant case is that the test of whether a substance is cocaine is fundamentally different from a test which takes two different samples, extracts a DNA profile from them, and then declares them to be a match based on probabilistic outcomes.

[13] Clearly, in <u>Fisher</u>, if testing were to show that the substance was not cocaine, the petitioner could not have been convicted for cocaine possession.  However, there was testimony available from police officers to indicate that the substance was cocaine, and the petitioner was arrested and charged based on the preliminary determinations that the substance was cocaine.  Here, Crews was identified, charged, and convicted entirely on the results of the test results – and no one had any other basis for suspecting his involvement in the crime. Additionally, because flight from prosecution suggests consciousness of guilt, the <u>Fisher</u> defendant's ten-year stint as a fugitive from these charges provided additional substantial evidence against him.  See <u>United States v. Jeffers</u>, 570 F.3d 557, 568 (4th Cir. 2009).

extending Youngblood to circumstances where the destroyed evidence was the crucial and determinative piece of evidence in the prosecution's case.

ii. Evidence Identified Suspect From Virginia Database

The fact that the destroyed evidence was not only the central piece of evidence in the prosecution, but also the basis for identifying Crews from a database search is a substantially different circumstance from Trombetta, Youngblood, and Fisher. In each of those cases, the defendant became a suspect on the basis of evidence other than that later destroyed by the state. Thus, for the evidence destroyed in those cases to have been "materially exculpatory," it would have had to demonstrably contradict the other evidence which was probative of guilt, e.g., the victim's identification of the suspect in Youngblood, the police officers' observations of impaired driving in Trombetta, and the police observations of drugs and the suspect's flight from prosecution in Fisher. In contrast, here the missing evidence which the Virginia Court of Appeals evaluated under the "materially exculpatory" standard of Youngblood was the only evidence relating to Crews, either inculpatory or exculpatory, which existed. The Virginia Court of Appeals, however, did not distinguish these circumstances and held only that "the possibility that evidence *could have exculpated a defendant* depending on future testing results is not enough to satisfy the constitutional standard of materiality." Slip Opinion, No. 1983-05-3, Court of Appeals of Virginia, April 26, 2006 (citing to Lovitt v. Warden, 266 Va. 216, 241, 585 S.E.2d 801, 815 (2003)). Although a true statement, this analysis presumes that the defendant had already been inculpated before the missing evidence was considered. Here the defendant had not been inculpated before, and could not have been inculpated without, the consideration of the now-missing evidence. Therefore, in the circumstances that exist in this case, the evidence does

not fit clearly into the Supreme Court's dichotomy of "materially exculpatory" vs. "potentially useful" evidence.

In fact, when the Youngblood principle is applied in circumstances where the destroyed evidence is the only evidence of a defendant's guilt, it is susceptible to the critique that it employs a circular logic on behalf of the prosecution.[14]   The breakdown of the distinction between materially exculpatory and potentially useful loses much of its meaning because there is no agreement that the defendant has been inculpated by any evidence.   But here, no party questioned the propriety of applying Youngblood when there was essentially only one piece of evidence.   It is troubling that this complexity was not discussed, particularly because it conflicts with one of the characteristics of constitutional materiality in Trombetta.   In Trombetta, the Supreme Court specifically noted that, along with exculpatory value, one characteristic of meeting the "standard of constitutional materiality" is that the evidence "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 489.   In Youngblood, however, the Court appeared to find this requirement from Trombetta applicable only where the "State...attempt[s] to make any use of the materials in its own case in chief." Youngblood, 488 U.S. at 56.   And by the time of the *per curiam* decision in Fisher, the Court seemed to abandon this requirement completely, and focus instead entirely on whether the evidence was inculpatory or exculpatory.   Fisher, 540 U.S. at

---

[14] If the prosecution were to allege that a particular item of evidence, now missing or destroyed, was actually probative of the guilt of a particular suspect, the court would not deem it "materially exculpatory."   Under Youngblood, therefore, no constitutional problems would arise from continuing a prosecution relying on that missing or destroyed evidence, because a court would deem it to be only "potentially useful."   If the Defendant wished to argue that the evidence was in fact **not** probative of guilt, Youngblood would still treat this argument as only alleging the evidence was potentially useful.   And because the evidence would still be unavailable, the defendant would be unable to challenge the prosecution's allegation that it was probative of guilt, and would be forced to allege bad faith – a difficult theory to prove.   In fact, reading Youngblood to require that the police *know* the evidence to be exculpatory, before granting the evidence constitutional protection might even incentivize police departments to destroy untested evidence if they suspect that it conflicts with other evidence they have gathered probative of a particular individual's guilt (in order to be sure of a conviction).   Again, a defendant would have no recourse under the principle established by Youngblood.

548. But in these circumstances it is troubling to declare the missing evidence inculpatory, and therefore only "potentially useful," when the missing evidence is the only inculpating evidence available and its inculpatory nature is what is challenged by the defendant. See n. 14 *supra*. The important context of the holdings in Trombetta, Youngblood, and Fisher was that the defendant faced other, substantial evidence probative of guilt.

Although in these circumstances the state made use of the evidentiary materials in its own case in chief and the evidence was of such a nature that the defendant was unable to obtain comparable evidence by other reasonably available means, the Court does not conclude that applying the principle of Youngblood was unreasonable. The Court's conclusion is buttressed by the Trombetta Court's explanation that the respondents in Trombetta had "alternative means of demonstrating their innocence." Trombetta, 467 U.S. at 490. The Supreme Court explained that the respondents could have raised the issues of "faulty calibration, extraneous interference with machine measurements, and operator error." Id. Specifically, "respondent could have utilized [the machine's weekly calibration results] to impeach the machine's reliability." Id. It was "possible to introduce at trial evidence demonstrating the defendant was dieting....or the test was conducted near a source of radio waves." Id. And the Court explained that "the defendant retains the right to cross-examine the law enforcement officer who administered the Intoxilyzer test, and to attempt to raise doubts in the mind of the factfinder whether the test was properly administered." Id. Clearly, Crews had each of these alternative means of demonstrating his innocence, or at the very least calling into question the strength of the government's evidence against him. In fact, the Court notes that Crews was apparently successful in calling into question the strength of the government's evidence in his first trial under nearly the same

circumstances.[15]   Additionally, Crews was in some ways better off than respondents in Trombetta, for whom even successfully discrediting the Intoxilyzer results might not have avoided their convictions as in "a prosecution for drunken driving that rests on police observation alone." Youngblood, 488 U.S. at 59. Here, had Crews been able to successfully discredit or call into question the DNA testing results, no reasonable person could have found him guilty because there was no other evidence against him.   Thus, the Court finds that the application of Youngblood in a situation where the only inculpatory evidence is the missing evidence is not unreasonable.

### iii.  Proper Interpretation of DNA Evidence

Although Crews was unable to discredit the DNA testing results, the Court is troubled by the fact that the state courts and both parties did not appropriately interpret the significance of the DNA testing results, primarily because they did not recognize the statistical significance of a "cold hit" where the suspect is identified after trawling a database for a match.   The statistical interpretation of DNA evidence that was presented by the Commonwealth's Attorney, and unchallenged by defense counsel, ignored the theoretical complexity of contextualizing a "cold hit" match from a DNA database within a criminal prosecution.   Instead, the Commonwealth's Attorney presented an interpretation of the DNA profile match consistent with the use of a DNA in a case where a suspect has already been inculpated by other evidence, thereby compounding the Court's concerns outlined in the previous section.   Nevertheless, the Court concludes that applying Youngblood was not unreasonable.

---

[15] Although the transcript from the first trial is unavailable, it appears that the only difference in evidence presented was that Investigator Hise changed his testimony as to the destruction of the evidence and presented an authorization slip he had signed for the destruction of the evidence. See 06/01/05 Tr. at 178.

To adequately consider how the evidence of the DNA match should have been interpreted, it is important to briefly describe how DNA analysis typically works.[16] Deoxyribonucleic acid ("DNA") is essentially the genetic code for the human body. It is present in the nucleus of virtually every cell, and each strand of DNA contains all of the genes for each particular individual. Although over 99% of human DNA does not vary from person to person, there are certain places on the DNA strand, called polymorphic regions, where the precise arrangement of the genes on the DNA double helix can differ between individuals. In these polymorphic regions, also known as "loci," different individuals will have slightly different forms of the same gene. These alternative forms of the genes are known as alleles. When a sample of biological material of unknown provenance is developed into a DNA profile, the forensic scientist looks at certain predetermined polymorphic regions or "loci" and "identif[ies] the alleles that make up the DNA sequence at those polymorphic [regions]." <u>United States v. Davis</u>, 602 F. Supp. 2d 658, 665 (D. Md. 2009). The record of which alleles are at each specific loci is known as the DNA profile. The analyst will then compare the DNA profile from the unknown biological sample to a profile created in the same way from the suspect's DNA. If the two samples' profiles match at a sufficient number of loci, the forensic analyst might suspect that the samples came from the same individual. But because "these partial profiles are *not* assumed to be unique, especially among close relatives,[17] the possibility of coincidental matches and their probabilities must be taken into account." <u>Id.</u> at 673 (emphasis in original). So the forensic analyst must "determine the significance of the comparison…[i.e.], how common or rare the

---

[16] For a more comprehensive explanation see Judge Titus's excellent explanation of DNA testing in <u>United States v. Davis</u>, 602 F. Supp. 2d 658 (D. Md. 2009).

[17] As an aside, the Court notes that petitioner had several other brothers who lived in Lynchburg at the time of the rape. A thorough investigation would have also sought to develop DNA profiles from those brothers and seek to exclude them from the being potential donors of the evidentiary sample.

particular DNA profile is based on population frequency data." Id. at 667.    The analyst generally determines how common or rare the "particular DNA profile is by multiplying the frequency of each of the alleles in the profile… thus finding the statistical frequency of the specific DNA profile….using [the] statistical concept known as the product rule."[18] Id.

In the typical case where DNA evidence is used in connection with other evidence probative of a particular suspect's guilt, simply finding the statistical frequency of a particular DNA profile is very useful.  In these cases, the statistical frequency number will simultaneously "express two distinct concepts…1) the expected frequency, or rarity, of that particular DNA profile in the population; and 2) the chance that the suspect's DNA profile might coincidentally, but incorrectly, match the evidentiary profile (the 'random match probability' or 'RMP')." Id. at 674.   It is this random match probability concept that is most frequently explained to juries.  For example, the jury might be told that given the rarity of the DNA profile, the odds that the defendant, who was first identified as a suspect using other evidence, just *coincidentally* has the same DNA profile as the individual who left the evidentiary DNA are, for example, fifty million to one.   In the instant case, a total of eight (8) loci were used to form the DNA profile of the perpetrator, and the corresponding rarity, or frequency in the black population, of the DNA profile was determined to be approximately ninety million to one.  See 06/01/05 Tr. at 138.  The analyst, however, also identified this ninety million to one number as the random match probability.   But in a "cold hit" case, where the suspect is first identified by a DNA profile

---

[18] The use of the product rule in DNA testing was also explained in United States v. Chischilly, 30 F.3d 1144, 1155 n. 14 (9th Cir. 1994).  "Whereas no two individuals (apart from identical twins) share the same overall DNA profile, 'no individual has a unique profile at a given locus.' Under the product rule, the probabilities of finding a match at each given locus on the samples…are multiplied together to calculate the random probability that the trace DNA found at the crime scene could have come from another member of the population." Id. (citations omitted).  In general, the product rule provides that if two (or more) events are independent of each other (which these alleles have been shown to be) the probability of each individual event occurring can be multiplied, and the resulting product is the probability of both (or all) events occurring. See Davis, 602 F. Supp. 2d at 674 n. 19 (citing United States v. Jenkins, 887 A.2d 1013, 1018 n. 6 (D.C. 2005)).

- 27 -

match in a database search, this interpretation of the statistical frequency number as also being the random match probability (or coincidental match probability) is inaccurate and misleading. [19] When searching a database of thousands, hundreds of thousands, or potentially millions of individuals, the odds that a *coincidental* match occurs increase dramatically.

Consider an analogy to the lottery. In a lottery, if you were to buy one single lottery ticket, the chances that the particular ticket *you hold* in your hand is the winning ticket might be fifty million to one. This is the equivalent to the rarity of the particular lottery numbers on your ticket. However, if the state lottery sold five million tickets, the chances that *someone* holds the winning ticket in their hand would be only ten to one; if they sold twenty five million tickets, a mere two to one. The rarity of each individual lottery number is still fifty million to one, but the chances of finding a match *somewhere* have skyrocketed. If the state lottery sold one hundred and fifty million tickets, one might expect there to be three individuals with the winning numbers.[20] In "cold hit" cases, therefore, the statistical relevance that a DNA profile match was found (a winning "ticket") depends on the size of the database being searched (the number of "tickets" sold) and declines as the size of the database increases. All of the courts to have considered this distinction have reached this same conclusion. See <u>Davis</u>, 602 F. Supp. 2d at 674 ("Because the search of the database increases the odds that a coincidental match will be found, the product rule calculation does not express the likelihood that a cold hit match is coincidental."); <u>United States v. Jenkins</u>, 887 A.2d 1013, 1018 (D.C. 2005) ("The product rule derived number no longer accurately represents the probability of finding a matching profile by

---

[19] Statisticians recognize this as the "ascertainment bias." See <u>United States v. Jenkins</u>, 887 A.2d 1013, 1018-19 n. 10 (D.C. 2005) ("Ascertainment bias is a term used to describe the bias that exists when one searches for something rare in a set database. Conceptually, the more populated the database is, the less impressive a match becomes.").

[20] Often times the largest lottery jackpots have several winners because so many tickets are sold. <u>See</u> Nicole M. Christian, <u>Two Winners Share the Biggest Lottery Jackpot in U.S. History</u>, N.Y. TIMES, May 11, 2000.

chance. The fact that many profiles have been searched increases the probability of finding a match."); People v. Nelson, 43 Cal.4th 1242, 185 P.3d 49 (2008) ("In a cold hit case the suspect is never randomly selected from the general population. Thus, when a suspect is found by a search of a large DNA database, the chance of a coincidental match is increased because a single genetic profile…is compared to a the very large number of profiles in these databases."). To provide the appropriate interpretation of a database match to a jury, it is widely accepted that some number other than the product-rule-derived rarity figure (or "random match probability") should be presented and considered. Although not without critics, the method suggested by the FBI's DNA Analysis Board and the National Research Council is the database match probability, determined by "multiplying the expected frequency of the profile (the rarity statistic, derived using the product rule) by the number of profiles in the database." Davis, 602 F. Supp. 2d at 675 (citing to National Research Council, *The Evaluation of Forensic DNA Evidence* (1996)). See also Jenkins, 887 A.2d at 1013 n. 14.   In this case, the database match probability that might have more appropriately indicated the chance that the DNA profile match was simply coincidental and not indicative of guilt would have been the product-rule-derived rarity figure (ninety million) divided by the size of the database (one hundred and thirty three thousand).[21] Thus the database match probability here might be as low as approximately six hundred and seventy seven to one (667 to 1).

In the instant case, therefore, it is clear that all the courts and all the parties inaccurately interpreted the significance of the "cold hit" profile match.[22]   But the Court must ask not which

---

[21] Testimony at the trial was unclear on the precise size of the database. See 06/01/05 Tr. at 157. Additionally, one would presumably need to only use the number of black individuals in the database as the denominator because the numerator, rarity figure, was calculated for only the black population.

[22] For example, defense counsel explained that the DNA test "excluded the possibility that someone other than the petitioner committed the rape….[and thus I] chose to challenge the admissibility of the DNA evidence…the

probability is a more accurate representation of coincidence, but whether the Virginia Court of Appeals, by accepting this flawed analysis in these circumstances to which it then applied the Youngblood precedent, engaged in an unreasonable application of clearly established federal law.   The Court thinks not.

The Court's conclusion is based primarily on the fact that, although the statistical interpretation of the DNA evidence was incomplete, if not entirely misleading, it is nonetheless clearly probative of guilt.   The essential basis for the Virginia Court of Appeals' decision was that the first DNA profile match was inculpatory and any further testing by Petitioner would have only been potentially useful.   And as a factual matter this conclusion is accurate – the rarity statistic derived from DNA profile match of eight loci *is probative* of petitioner's guilt.   All the courts which have distinguished between the rarity statistic and the database match statistic have concluded as much and permitted the rarity statistic to be admitted as evidence.   Davis, 602 F. Supp. 2d at 677 ("There is no basis under Daubert or the Federal Rules of Evidence to exclude evidence of the DNA matches in this case...ultimately, it shall be for the jury to decide the appropriate weight to assign to the forensic evidence."); Jenkins, 887 A.2d at 1023 ("The arguments raised by each of the proponents simply state that their formulation is more probative, not more correct...the debate cited by Mr. Jenkins is one of relevancy, not methodology....there is no basis...to exclude the DNA evidence in the case."); Nelson, 43 Cal.4th at 1263, 185 P.3d at 64 ("Thus, the question of how probable it is that the *defendant*, not the database, is the source of the crime scene DNA remains relevant...the rarity statistic addresses this question.") (emphasis

lynchpin of the Commonwealth's case."   Final Order, Crews, at Pg. 5.     The forensic testimony and the Commonwealth Attorney's arguments during the trial were crystal clear misrepresentations of the significance of the database match.   See 06/01/05 Tr. at 213, "And it matches to the point of the odds of randomly selecting an unrelated individual being one in ninety million in the black population."   The Virginia Court of Appeals' holding appeared to endorse the Commonwealth Attorney's misguided and exclusive reliance on the rarity statistic, "Appellant's DNA matched...such that another match would have the odds of one in ninety million in the black population."   Slip Opinion, No. 1983-05-3, Court of Appeals of Virginia, Pg. 2 (April 26, 2006).

in original).  Had the trial court recognized this distinction, presumably, it would have still allowed the rarity statistic to be introduced as evidence.[23]

Although the trial court and the Virginia Court of Appeals both may have misinterpreted the significance of the DNA profile match, they were not incorrect in concluding it was probative of Mr. Crews' guilt.  Accordingly, the evidence could *only* reasonably be considered to be "potentially useful" and not "materially exculpatory."  Although Crews understandably desired to retest the unknown sample at a more discerning level of scientific certainty, the fact that the evidence had been inadvertently destroyed does not change his underlying situation.  His circumstances still basically mirror those present in Youngblood: "the possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality."  Youngblood, 488 U.S. at 56 n. *.  And as in Fisher, "police testing indicated that the chemical makeup of the substance inculpated, not exculpated, [petitioner]."  Fisher, 540 U.S. at 548.  This Court must conclude that another test of the PERK kit sample was merely potentially useful: "at most, [petitioner] could hope that, had the evidence been preserved, [another] test conducted on the substance would have exonerated him."  Id. Thus, notwithstanding the errors in statistical interpretation present in this case, the Court concludes that applying Youngblood in these circumstances, though somewhat troubling, was not applying a precedent in "a context different from the one in which the precedent was decided and one to which the extension of the legal principle of the precedent is not reasonable." Robinson, 438 F.3d at 355.  Thus, the application of the Youngblood principle in these circumstances was not an unreasonable application of clearly established Federal law.

---

[23] But see, Davis, 602 F. Supp. 2d at 677 ("However, the Government shall only be permitted to present the product rule calculation as an expression of the rarity of the profile, but not as an expression of the random match probability, i.e., the answer to the coincidence question.").

### C. Policy Implications of Permitting Evidence

Although the Court holds that the Virginia Court of Appeals did not unreasonably apply clearly established Federal law, the Court grants a certificate of appealability because the application of the Youngblood principle in these circumstances is fraught with consequences for the constitutional rights of defendants.   In Illinois v. Fisher, Justice Stevens noted for the second time that some circumstances may require a different approach.   "There may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair."   Fisher, 540 U.S. at 549 (Stevens, J., concurring in the judgment) (citing Youngblood, 488 U.S. at 61 (Stevens, J., concurring in the judgment)).   In both of those cases, however, Justice Stevens did not feel that the situation warranted the development of a different approach.  Petitioner asserts that the instant case presents a situation precisely analogous to the concern of Justice Stevens: the "destruction of evidence…so critical to the defense as to make a criminal trial fundamentally unfair."  Id.   Although this Court does not presume to declare this criminal trial fundamentally unfair because of destruction of evidence, nor to declare the Virginia Court of Appeals to have been unreasonable in rejecting that argument, there are several disquieting implications apparent when Youngblood is applied in these circumstances that are pertinent to the precise concern of Justice Stevens.

### 1. Policy Concerns Supporting Youngblood Principle Do Not Apply

None of the policy concerns that the Supreme Court outlined in Youngblood are applicable in these circumstances.  First of all, the Youngblood Court was reluctant to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."  Youngblood, 488

U.S. at 58.   But here, requiring the police to preserve DNA samples from a stranger-rape investigation with no suspects is not "material that might be of conceivable evidentiary significance" but rather material that is certain to be of utmost evidentiary significance to either the prosecution or an innocent defendant.   The Youngblood Court also decided that it wished to avoid forcing courts to evaluate the significance of destroyed evidence, because "whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id.  But here any hope of avoiding the "treacherous task of divining the import of material whose contents are unknown, and, very often, disputed" has already been dashed. Id.   In these circumstances there is not just a dispute as to the import of the material, but whether, in fact, the "contents" of the evidentiary material are known or unknown.   And both the trial court and jury were forced to engage in that specific treacherous task.   Finally, the Youngblood Court wished to limit the police's obligations to preserve evidence to only "those cases in which the police themselves by their conduct indicate that the evidence *could form* a basis for exonerating the defendant." Id. (emphasis added).   Here, clearly the PERK kit evidence could form the basis for exonerating *a defendant*.   And according to the state, the PERK kit was destroyed prior to identifying any suspect – thus it appears that obligating the police to preserve this type of evidence is completely consistent with the Youngblood policy.

### 2.   Virginia Policy Supports Obligating Police to Preserve DNA Evidence

Petitioner incorrectly asserted in his § 2254 petition that he had a statutory right to have the PERK kit preserved.  He cited to VA. CODE ANN. §§ 19.2-270.4:1 and 19.2-327.1 to support his position.  Of course, petitioner does not have any federally cognizable habeas rights that arise from state provisions.   See 28 U.S.C. § 2254(a).   Moreover, the statutory provisions that

- 33 -

Petitioner cites to are inapplicable to his precise situation.   See VA. CODE ANN. § 19.2-270.4:1(A) ("Upon motion of a person convicted of a felony...the court shall order the storage preservation and retention of...human biological evidence...for up to 15 years."); VA. CODE ANN. § 19.2-327.1(A) ("Any person convicted of a felony may...apply for a new scientific investigation of any human biological evidence related to the case...if [certain specifications are met]").  Both of these provisions specifically refer to preserving biological evidence *after trial* for future testing by the convicted defendant.   Here the biological evidence was apparently destroyed before he was convicted, or even charged.   Nevertheless, Petitioner is correct in so far as these statutes indicate that Virginia policy is to preserve and subject to approved scientific tests all human biological evidence used to convict someone of a felony.    Apparently, these provisions of the Virginia code did not anticipate that a prosecution might go forward when the human biological evidence is destroyed prior to trial and conviction, perhaps anticipating that this evidence would be otherwise protected by Brady or other evidence rules.   The Court also notes that the Virginia statutes made clear that this obligation extends to "local law-enforcement agenc[ies]...[who] shall take all necessary steps to preserve, store, and retain the evidence." VA. CODE ANN. § 19.2-270.4:1(C).   And it strains the imagination to believe that the Virginia legislature wished to sanction or permit prosecutors or investigators to destroy evidence prior to a conviction to stymie the purpose of these provisions.   Thus, although not cognizable in a federal habeas petition, the Court recognizes the conflict between Virginia policy as demonstrated by the above cited provisions and the Court's holding in this case.[24]   The Court wishes to note, moreover, that the policy indicated by these Virginia provisions is the same

---

[24] On the other hand, the court notes that VA. CODE ANN. § 19.2-327.1(G) decrees that an "action under this section...shall not form the basis for relief in any habeas corpus proceeding."  See also VA. CODE ANN. § 19.2-270.4:1(E) (same); In re Pierce, 44 Va. App. 611, 606 S.E.2d 536 (Va. App. 2004)(same).

policy recommended by the American Bar Association with respect to human biological evidence. <u>See</u> 2 Crim. Prac. Manual § 73:41, ABA Criminal Justice Standards on DNA Evidence, Standard 2.6 ("Property containing DNA evidence obtained in the investigation of an unsolved homicide, rape or other serious offense, and the extract from such evidence, if any has been obtained, should be retained in a manner that will preserve the DNA evidence. A jurisdiction should promulgate written rules in all cases, which should require authorization of the prosecutor before the property or extract is destroyed or discarded.").

The concept of preserving DNA evidence for future testing was popularized by the success of the Innocence Project, which primarily used DNA testing to exonerate defendants who had been convicted on the basis of other evidence.[25]   All around the country, policies such as Virginia's and that recommended by the ABA, were promulgated in large part because of the success of the Innocence Project.[26] But even in cases such as the instant one where some limited DNA testing was performed, the argument for preserving biological material for future testing is also strong, as it would allow for increased certainty in the results.

One example of increased certainty comes from later scientific improvements.  At the time the sample was tested, only eight loci were used to create the profile.  Now Virginia labs use sixteen loci, which increases the accuracy of the rarity statistic exponentially.  <u>See</u> 06/01/05 Tr. at 161.   And as the district court in <u>Davis</u> recognized, this is even more important in a "cold hit" case: "The database match probability has the most impact on the reliability of a cold hit match when few loci are tested because one is obviously more likely to find a coincidental match at seven or eight loci than at twelve or thirteen, and this likelihood only increases with the

---

[25] <u>See</u> http://www.innocenceproject.org, run by The Benjamin Cardozo School of Law at Yeshiva University.

[26] <u>See</u>, for example, the Innocent Project's Model Legislation page, available at http://www.innocenceproject.org/fix/Model-Legislation.php, last visited 03/24/2010.

number of profiles compared." Davis, 602 F. Supp. 2d at 676.  Preserving the DNA sample would have allowed for more accurate testing at sixteen loci, not eight.

Another example of increased certainty would be to reduce the possibility of any operator error.  Typically, when a database cold hit is found, the suspect's DNA is compared again to the unknown DNA to reconfirm the profiles match.  See Davis, 602 F. Supp. 2d at 660-61.  Notably, the fact that the PERK kit had been destroyed was first noticed by the LPD when they themselves requested that the PERK kit be sent back to the lab for additional testing prior to trial. See 06/01/05 Tr. 104-6.  Presumably, the LPD and Commonwealth Attorney believed additional testing would strengthen their case.  Additionally, preserving already tested DNA for future independent tests may avoid situations such as the widespread failure in West Virginia's police crime labs.  See In re W.Va. State Police Crime Lab., Serology Div., 438 S.E.2d 501 (W.Va. 1993).  Thus, for a variety of reasons, preserving the PERK kit would have provided certainty that operator error had not affected any of the results.

### 3. Appearance of Burden Shifting

Finally, the circumstances of this case are troubling because the prosecution of Crews on the basis of one piece of evidence, destroyed before he is allowed to test it, presents an uncomfortable resemblance to unconstitutional burden shifting.  "Due process commands that no man shall lose his liberty unless the Government has borne the burden of convincing the factfinder of his guilt."  In re Winship, 397 U.S. 358, 364 (1970).  Cases where only one piece of forensic evidence is presented as the entirety of the prosecution's case in chief, though technically not running afoul of Winship or other controlling precedent, give the appearance of requiring the defendant to disprove the forensic evidence and demonstrate his innocence. Although forensic testing has been shown to be susceptible to many flaws, it simultaneously

enjoys many protections from legislators, prosecutors and courts, the final result of which often transforms forensic testimony, i.e. "the State's partisan allegations," into "incontrovertible and unconstitutional presumptions." See Pamela Metzger, Cheating the Constitution, VAN. L. REV. 475, 481 (2006).   And when the actual forensic evidence is unavailable, as it was here, the defendant's opportunity to disprove the forensic scientist's conclusion is reduced to cross-examination. See Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527 (2009).

But of course the cross-examination mandated by Melendez-Diaz, particularly in circumstances such as these, may not effectively serve the framer's purpose in drafting the Confrontation Clause, which was to eliminate the use of "ex parte examinations against the accused." Crawford v. Washington, 541 U.S. 36, 50 (2004).   Although Crews may not be innocent, and the DNA profile match is significant evidence suggesting that he is, in fact, guilty of raping Ms. Lipscomb, the prosecution of Crews is troubling.   The situation he faced when prosecuted for the rape, were it to happen to a demonstrably innocent individual, is outright chilling.   One day, a police officer approaches an innocent individual and tells him that his DNA matches DNA evidence from an unsolved rape case from several years prior.   The innocent man is arrested and charged with the rape, and in his defense, he seeks to independently test the old DNA sample with the newest science.   He is told that the material tested is unavailable, but the test results indicating his guilt will be admissible in court.   If the individual was not out of the country, or imprisoned, when the rape occurred, it may be very difficult to present an alibi or any defense at all.   Similarly, it would be nearly impossible to discredit or impeach the prosecution's evidence.   It is a thoroughly terrifying proposition.

- 37 -

## IV. Conclusion

Although the policy underlying <u>Youngblood</u> is inapplicable to these circumstances, and other policy grounds strongly support the petitioner's arguments, it is not the province of this Court to make those policy determinations. It is the province of this Court to determine whether or not the Virginia Court of Appeals engaged in an unreasonable application of clearly established federal law. It did not. The Virginia Court of Appeals relied on <u>Youngblood</u> when it determined that Petitioner's right to Due Process under the Fourteenth Amendment was not infringed when the trial court permitted the Commonwealth's Attorney to introduce at trial DNA results inculpating the Petitioner, over Petitioner's protestations. The Virginia Court of Appeals determined that, although, the petitioner was unable to test the evidence because it had inadvertently been destroyed, the destruction of evidence that is merely "potentially useful" does not implicate Due Process concerns unless it was destroyed in bad faith. Petitioner did not allege bad faith, nor was there any evidence of bad faith. For the stated reasons, the United States' Motion to Dismiss (Dkt. No. 9) is **GRANTED** and Petitioner's 28 U.S.C. § 2254 Motion (Dkt. No. 1) is **DENIED**. An appropriate order shall issue this day.

Crews is advised that he may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a judge of the United States Court of Appeals for the Fourth Circuit or this court issues a certificate of appealability pursuant to § 2253(c). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). This court finds that Crews has demonstrated such a showing, and thus **ISSUES** a certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003); <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).

- 38 -

The Clerk is directed to send copies of this memorandum opinion and the accompanying final order to the petitioner and counsel of record for the respondent.

**ENTER:** This _29th_ day of March, 2010.

Senior United States District Judge